IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| | | |
|---|---|---|
| THE GUARDIAN LIFE INSURANCE CO. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-1745 |
| | § | |
| GARY KINDER, ET.AL., | § | |
| | § | |
| Defendants | § | |

## OPINION AND ORDER

Before the Court, with the consent of the parties,[1] is the Motion for Summary Judgment filed by Plaintiff/Counter-Defendant Guardian Life Insurance Company of America (hereinafter "Guardian") against Defendants/Counter-Plaintiffs Gary Kinder, Cornerstone Financial Group, Inc., and Gary Kinder & Associates, Inc. (Docket Entry ("Doc.") No. 60). Defendants/Counter-Plaintiffs filed their Response to Guardian's Motion, along with numerous exhibits (Doc. No. 75), to which Guardian replied. (Doc. No. 77). Defendants/Counter-Plaintiffs then filed their Sur-Reply (Doc. No. 80) and tendered additional evidence (Doc. No. 90). Guardian then filed a Response. (Doc. No. 91). Having carefully considered the parties' motions, responses, replies and sur-replies; the parties' submissions; and the applicable law, the Court, for the reasons set forth below, is of the opinion that Guardian's Motion for Summary Judgment should be granted as to all Counter-Plaintiffs' claims; granted as to its breach of contract claim against Defendants Cornerstone

---

[1] Docket Entry Nos. 105 & 106.

1

Financial Group and Gary D. Kinder & Associates, Inc., but denied as to Defendant Gary D. Kinder in his individual capacity; and granted as to its request for attorney fees against Defendants Cornerstone Financial Group and Gary D. Kinder & Associates, Inc.

## I.  BACKGROUND

The Court will not recite the well-known standard of review for summary judgment except to state that it has, as it must, viewed the evidence and inferences to be drawn therefrom in the light most favorable to Defendants. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.")

### A.  Factual Background

In January of 1999, Guardian Life Insurance Company of America hired Gary Kinder as a career development manager ("CDM").  As a CDM, Kinder managed Guardian's general agency in Houston, Texas, as their employee.  Kinder worked as a CDM managing Guardian's agency from 1999 to 2001 and, during that time, he incurred losses of $536.030 in 1999; $692,550 in 2000; and $696,559 in 2001.  (Doc. No. 60-6 at 6-8 of 50).  Guardian, as Kinder's employer, assumed the losses, which totaled $1,925,139.00.  (Doc. No. 60-6 at 8 of 50).

In 2002, after working as a CDM for three years, Kinder, with the assistance of Guardian, chose to open his own general agency in Houston, Texas.  (Doc. No. 60-6 at 11-12 of 60).  As a general agent, Kinder was no longer a Guardian employee, but an independent contractor.  Further, unlike his position as a CDM, as a general agent, Kinder was now responsible for any losses incurred by the agency.

To facilitate the transition to his own general agency, Kinder entered into several contracts

with Guardian.  The agreements between the parties consisted of an Agreement of General Agency,

an Agreement of General Agency - Promissory Note, a promissory note for future liability from

Kinder, and a Services Agreement.

<u>2002 Agreements</u>

     1.  <u>*Agreement of General Agency*</u>

In the initial 2002 Agreement of General Agency with Guardian, Kinder listed the Principal

as Gary Kinder, d/b/a Cornerstone Financial Group.  (Doc. No. 60-3 at 11 of 54).  Gary Kinder,

d/b/a Cornerstone Financial Group was an unincorporated, sole proprietorship.  Guardian,

apparently not satisfied with this, required that the 2002 agreement be modified to reflect the

Principal as a incorporated entity.  Gary Kinder incorporated his business and the agreement was

re-signed, effective January 1, 2002, to reflect Cornerstone Financial Group, Inc. as the Principal.[2]

(Doc. No. 60, Ex. A (Kinder Deposition) at 68:23-25; 69:1-2; 43:3-25; 44-45).  Aside from the

change in the Principal, the terms and conditions of the two 2002 Agreements of General Agency

were the same.

The 2002 Agreement of General Agency provided, in relevant part, the following:

> (E) INDEPENDENT CONTRACTOR
> Nothing herein contained shall be construed to create the relation of
> employee and employer between the Principal and the Company.
>
> *      *      *

---

[2] There is no dispute that Cornerstone Financial Group is Gary D. Kinder and Associates, Inc. (Doc. No. 50, Ex. A at 59:14-19).  Kinder explained that, while the agreement was in the name of Cornerstone Financial Group (Doc. No. 60, Ex. A at 65:4-9), whereas he was incorporated as "Gary D. Kinder and Associates," he filed an assumed name certificate with the State of Texas for Cornerstone Financial Group. (Doc. No. 60, Ex. A 44:6-25; 45:1-3).

(F) FAILURE TO ENFORCE IS NOT A WAIVER
Failure or omission of the Company to enforce any of the provisions of this
Agreement or the failure or omission of the Company to exercise any of its
rights or privileges under this Agreement shall not be deemed a waiver of
any such provisions, rights, privileges, or terms.  Any modification of any
provision of this Agreement shall be made only in writing by an authorized
Officer of the Company.

(G) ENTIRE AGREEMENT
This instrument contains all the agreements and conditions made between the
parties hereto whether oral or written.  Any additions thereto or alterations
or changes in this Agreement or other agreements hereinafter made to be
binding, must be in writing signed by both parties.

(Doc. No. 60-3 at 28 of 54; *see also*, Doc. No. 60, Ex. A at 41:15 - 42:1).

The Agreement also provided that it "is made between the parties for an indefinite period.
It may be terminated as stated in Section 5."  (Doc. No. 60-3 at 11 of 54).  Section 5 of the
Agreement of General Agency contained the parties agreement on termination and expressly
provided that "[t]his Agreement may be terminated at any time by either party by notice in writing
to the other party."  (Doc. No. 60-3 at 32 of 54).  Further, in the event of termination, the
Agreement addressed  repayment of any indebtedness.  In particular, Section 6 of the Agreement
of General Agency, entitled "Miscellaneous Provisions," expressly provided that "[a]ny and all
indebtedness to the Company is due and payable in cash on demand to the Company by the Principal
or his estate, executors, administrators or assigns and, in any event, on the termination of this
Agreement of the Agency" and that the "[t]he Company's books and records shall constitute
evidence of such indebtedness."  (Doc. No. 60-3 at 26 of 54).

Finally, the contract expressly provided that "[a]ll Agreements heretofore entered into by
and between the parties hereto, whether oral or in writing, are hereby released, abrogated, and
declared to be null, void and of no effect…"  (Doc. No. 60-3 at 27 of 54).

4

2.  *Agreement of General Agency - Promissory Note*

Along with the Agreement of General Agency, Kinder also executed a "Agreement of General Agency - Promissory Note" (hereinafter "Promissory Note").  Similar to the initial 2002 Agreement of General Agency, the Promissory Note initially named Gary Kinder d/b/a Cornerstone Financial Group as the promisor, but the Agreement was modified and re-signed to reflect the incorporated entity, Cornerstone Financial Group, Inc., as the promisor.  Aside from the change in the promisor, both of the 2002 Agreements were the same.  The modified 2002 Agreement, which was effective January 1, 2002, was signed by Gary Kinder on behalf of Cornerstone.  (Doc. No. 60-4 at 45 of 46).

Under this Agreement, Guardian agreed to lend money to the general agency for its operations in exchange for the Cornerstone Financial Group's promise to pay any debt incurred. In particular, the Agreement provided the following:

> The Guardian shall lend recurring sums to the GA [General Agency], subject to periodic revision at the sole discretion of the Guardian . . . .  At the conclusion of each calendar year and at the termination of the Agreement of General Agency, GA earnings . . . shall be applied to the loans with any excess of the earnings over the loans paid to the GA in cash.  If loans exceed earnings, the deficiency shall become an interest-bearing indebtedness of the GA to The Guardian at an interest rate established by Guardian's Board of Directors.  The GA personally promises to repay such interest-bearing indebtedness on demand to The Guardian.  If the GA is a corporation, the officer/stock-holders personally promise to repay such interest-bearing indebtedness on demand to The Guardian.  Unless otherwise agreed to in writing by the GA and The Guardian, any interest-bearing indebtedness resulting from the excess of loans over GA earnings shall be repayable in full no later than December 31 of the calendar year next following the calendar year of its creation.
>
> *   *   *
>
> Guardian's books and records . . . shall be sufficient evidence of the lending of the funds outlined in this Agreement of General Agency promissory note.

(Doc. No. 60-4 at 43 of 46).

### 3.   *Personal Note for Future Liability*

In addition to the corporate entity's promissory note, Gary Kinder executed a "Personal Note

for Future Liability" in which he agreed to personally guarantee any debt incurred by the General

Agency.  This Agreement provided the following:

> …in consideration of his appointment as an incorporated general agent and
> his eligibility to receive immediate financial assistance in the form of expense
> advances and other loans, the Promisor [Kinder] hereby personally
> guarantees, absolutely and unconditionally, the repayment of all indebtedness
> to Guardian created by the Promisor or his corporation during the time he is
> a Guardian general agent.
>
> *   *   *
>
> Unless otherwise agreed to in writing by the Promisor and Guardian in a
> separate promissory note or other document creating personal liability, any
> interest-bearing indebtedness as described above shall be repayable in full no
> later than December 31 of the calenda[r] year next following the calendar
> year of its creation.  Guardian's books and records . . . shall be sufficient
> evidence of the lending of the funds outlined in this agreement.
>
> *   *   *
>
> This acceptance of personal liability is a continuing obligation and shall
> remain in full force and effect irrespective of any interruptions in the business
> relations of the Promisor with Guardian, including termination of the
> Agreement of General Agency by either party.

(Doc. No. 60-5 at 1 of 40).

### 4.   *Services Agreement*

Finally, also effective January 1, 2002, Guardian and Gary Kinder d/b/a Cornerstone

Financial Group entered into a "Services Agreement."  (Doc. No. 60-5 at 3 of 40).  Similar to the

other agreements, the "Services Agreement" was modified to reflect Guardian's Agreement was

with the corporate entity—namely, Cornerstone Financial Group.  (Doc. No. 60-6 at 4 of 50).

Under this contract, Guardian agreed, for an annual fee, to handle certain record processing for the Cornerstone Financial Group/Gary D. Kinder & Associates which, for example, included maintaining personnel records, processing payroll checks and similar payments.  (Doc. No. 60, Ex. A at 56:18 - 57:3; 57:14-25).  In addition, Guardian agreed, in exchange for payment of an annual percentage, to provide Cornerstone/Kinder employees security benefit coverage, which included group life, health, and disability insurance and a qualified pension plan.  (Doc. No. 60, Ex. A at 57:6-12).  Cornerstone/Kinder not only agreed to repay Guardian all sums processed for salaries, taxes, fees and other amounts paid on its behalf, but also agreed that such sums would be an item of indebtedness mentioned in the 2002 Agreement of General Agency and, if not paid, would be included in Guardian's Annual Interest Statement.

2003 Agreements

Effective January 1, 2003, Guardian and Cornerstone Financial Group, Inc. entered into an Agreement of General Agency.  (Doc. No. 60-5 at 7 of 40).  Gary Kinder signed on behalf of Cornerstone Financial Group.  (Doc. No. 60-5 at 7 of 40).  Aside from expanding the geographic territory of the General Agency from a few select counties to the entire state of Texas, the provisions remained the same as the 2002 Agreement.  (Doc. No. 60-5 at 8 of 40; Doc. No. 60-6 at 2 of 50).  The other Agreements also remained the same.

Cornerstone/Kinder's Agreement With USAA

Following the inception of his general agency in 2002, Kinder began experiencing difficulty meeting his business projections and his agency incurred debt.  In light of this difficulty, concerns mounted from Guardian regarding the agency and its debt.  In an attempt to increase his agency's

business, Kinder approached the Life General Agency of United Services Automobile Association's ("USAA") with a proposal to obtain their business. Kinder projected that an agreement with USAA would substantially increase the profitability of his general agency and discussed his projections with Guardian. Kinder was ultimately successful in obtaining USAA's business. However, without the express approval of the senior management at Guardian, Kinder entered into an Agreement with USAA on April 19, 2004.

The Agreement consisted of a Services Agreement and a Brokerage Agreement. (Doc. No. 60, Ex. A 13:19-24 & Ex. B at 4:17-22; 8:16-18; 11:8-22). The Services Agreement related to providing USAA members with Guardian products and services. (Doc. No. 60, Ex. B at 14:10-13; 15:14-17:7). The Brokerage Agreement provided that it would run for an indefinite period of time "subject to termination at any time by either of the parties by notice in writing, or automatically by nonrenewal of Guardian appointment, state license, or termination of the principal's agreement with the company." (Doc. No. 60, Ex. B at 6:11-16 & Deposition Ex. 41; Doc. No. 73-3 or "GLIC 01173"). Kinder signed the Agreements with USAA Life Insurance Company on behalf of the principal Cornerstone Financial Group/Gary D. Kinder & Associates, Inc. (Doc. No. 60, Ex. B at 6:17-22; Doc. No. 73-3 or "GLIC 01174").

Guardian Terminates its Agreements With Cornerstone/Kinder

In mid-2004, Guardian sent Kinder written notice of its intent to terminate the General Agency and Services Agreement with Cornerstone/Kinder due to the excessive debt incurred. The Guardian Agreement was terminated on July 13, 2004. Further, upon termination, Guardian requested that Cornerstone/Kinder repay the debts incurred by the Agency.

Following the termination of its contract with Cornerstone/Kinder, Guardian hired another

individual, Richard Ray, to work as a Guardian CDM for the Houston, Texas area.  Shortly after assuming the job as a CDM, Ray raised concerns with Guardian about the profitability of the USAA deal based on the terms agreed to by Cornerstone/Kinder.  While Guardian initially honored the Services and Brokerage agreement that Cornerstone/Kinder had entered into with USAA, the agreements were later dissolved.

**B.  Procedural History**

On May 23, 2006, Guardian brought this action in federal court against Defendants Gary D. Kinder, Cornerstone Financial Group, Inc. and Gary D. Kinder & Associates, Inc. (hereinafter "Defendants") based on diversity jurisdiction.  Guardian alleges that Defendants are in breach of the contracts and, as of August 1, 2008, seeks recovery in the amount of $1,321,616.14.  Guardian requests a judgment against all Defendants jointly and severally and, in the alternative, against Gary Kinder, individually, for the damages resulting from the breach of contract, "reasonable and necessary attorney's fees," pre- and post-judgment interest, and all the costs of suit.  (Doc. No. 20 at 19).

Defendants filed an Answer.  Defendants maintain that, based on oral assurances and agreements that were made at the time Kinder was recruited to undertake the general agency relationship, Guardian wrongfully terminated the agreements.  In addition, Defendants Gary D. Kinder and Gary D. Kinder & Associates, Inc. (hereinafter "Counter-Plaintiffs) brought counter-claims against Guardian alleging violations of the Texas Insurance Code and the Texas Theft Liability Act, common law fraud, fraud in the inducement, unjust enrichment, constructive trust, conversion, and tortious interference with their contracts with USAA.  (Doc. No. 121 at 22-24).

On September 2, 2006, Gary D. Kinder and his wife, in their individual capacities, filed for

federal bankruptcy protection under Chapter 11.[3]  *In re Gary D. Kinder and Rebecca R. Kinder*, 4:06-34487 (Bankruptcy Ct. S.D. Tex. 2006).   On November 22, 2006, Guardian sought and received relief from the automatic stay provision of the Bankruptcy Code in order to proceed with this action.  (Bankruptcy Docket Entry No. 22).

On August 1, 2008, Guardian moved for summary judgment as to the numerous counter-claims asserted against it and also as to its breach of contract claim against Defendants.  (Doc. 60 at 2).  Defendants/Counter-Plaintiffs filed a Response to Guardian's Motion for Summary Judgment (Doc. No. 60) and Guardian replied.  (Doc. No. 77).  Defendants/Counter-Plaintiffs then filed a Sur-Reply  (Doc. No. 80) to which Guardian responded.  (Doc. No. 91).  The Motion is ripe now for adjudication.

## II.  DISCUSSION

### A.  Counter-Claims

#### 1.  *Texas Insurance Code & DTPA Claims*

Counter-Plaintiffs allege that Guardian violated § 541.001(1) and (2) of the Texas Insurance Code and, as a result, they are entitled to relief under the Texas Insurance Code and the Texas Deceptive Trade Practices Act ("DTPA").

The purpose of § 541.001 of the Texas Insurance Code is to "regulate trade practices in the business of insurance by: (1) defining or providing for the determination of trade practices in this state that are unfair methods of competition or unfair or deceptive acts or practices; and (2) prohibiting those trade practices."  TEX. INS. CODE § 541.001 (Vernon 2009).  To prevail on a

---

[3] Kinder's Chapter 11 bankruptcy proceeding was converted to a Chapter 7 case with an effective date of June 1, 2007.  (Bankruptcy Docket Entry No. 47).

claim under § 541 of the Texas Insurance Code, a plaintiff must establish the following: (1) each of the parties is a "person" as defined by § 541.002; (2) the defendant engaged in an act or practice that violated § 17.46(b) of the Texas Business and Commerce Code; (3) the plaintiff relied on the act or practice to their detriment; and (4) the defendant's act or practice was a producing cause of actual damages.   *See* TEX. INS. CODE § 541.151 (Vernon 2009); TEX. BUS. & COM. CODE § 17.50(a) (Vernon Supp. 2008).

With regard to the second element of this claim, Counter-Plaintiffs allege that Guardian violated §§ 17.46(b)(12) and (b)(24) of the Texas Deceptive Trade Practices Act ("DTPA").  More specifically, Counter-Plaintiffs contend that Guardian "represented that the agreements at issue conferred or involved rights, remedies, or obligations which they did not have or involve" and that Guardian "failed to disclose information concerning the contracts at issue in this case…."  (Doc. No. 121 at 23, ¶ 5(a) & (b)).  Guardian maintains that Counter-Plaintiffs' claim fails as a matter of law because they cannot establish a violation of either provision of the DTPA.

The purpose of the DTPA is to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty.  TEX. BUS. & COM. CODE § 17.44; *West Anderson Plaza v. Feyznia*, 876 S.W.2d 528, 532 (Tex.App.-Austin 1994, no writ). It is a violation of § 17.46(b)(12) of the DTPA for a party to represent that an agreement confers or involves rights, remedies, or obligations which it does not have or involve. TEX. BUS. & COM. CODE § 17.46(b)(12) (Vernon Supp. 2008).  In the present case, although Counter-Plaintiffs allege that Guardian made them a five-year oral agreement, which conferred rights, remedies, and obligations that the written agreement did not have, the evidence does not support their claims. Rather, the contract unambiguously provided that the agency agreement could be terminated by

either party, without cause, at any time.  Nowhere in the written agreement is it expressly stated or implied that Counter-Plaintiffs were being hired as a general agency for a term of not less than five years as they now allege.  Accordingly, Counter-Plaintiffs have failed to establish a violation of § 17.46(b)(12).

Counter-Plaintiffs' claim that Guardian violated § 17.46(b)(24) fares no better.  It is a violation of § 17.46(b)(24) of the DPTA to "fail…to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed."  TEX. BUS. & COM.CODE § 17.46(b)(24) (Vernon Supp. 2008).  The term "goods" means "tangible chattels or real property purchased or leased for use"; and the term "services" means "work, labor, or service purchased or leased for use including services furnished in connection with the sale or repair of goods."  TEX. BUS. & COM.CODE § 17.45(1) & (2) (Vernon Supp. 2008).  The term "goods" does not encompass intangibles. *Hendricks v. Thorton*, 973 S.W.2d 348, 356 (Tex.App.–Beaumont 1998, writ denied).  Nor does "goods" or "services" include loans of money or extensions of credit.  *La Sara Grain Co. v. First Nat'l Bank*, 673 S.W.2d 558, 567 (Tex. 1984); *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169, 174 (Tex. 1980); *Maginn v. Northwest Mortgage, Inc.*, 919 S.W.2d 164, 166-67 (Tex.App.–Austin 1996, no writ).  Counter-Plaintiffs' claim fails because they do not allege that the agreements, which involve intangibles (*e.g.*, the granting of a general agency, a loan of money, or an agreement as to how indebtedness is to be repaid) constitute goods or services as required by § 17.46(b)(24).

Nevertheless, even assuming that Counter-Plaintiffs could establish a violation of 17.46(b)(12) or (b)(24), their claims would still fail.  In particular, with regard to the third element

required to establish a prima facie claim, Counter-Plaintiffs allege that Guardian entered into an oral agreement which afforded them five years to repay any indebtedness they incurred and that they detrimentally relied on this representation when entering the agreement.  Guardian maintains that Counter-Plaintiffs cannot establish detrimental reliance because the alleged five-year agreement is directly contradicted by the express, unambiguous terms of the written agreement.  On this point, the Court must agree with Guardian.

The law provides that "reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law."  *DRC Parts & Accessories, LLC v. Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex.App.–Houston [14th Dist.] 2003, writ denied) (recognizing that "a party who enters into a written contract while relying on a contrary oral agreement does so at its peril").  In the present case, the undisputed evidence establishes that Kinder agreed that, whether oral or written, the Agreements of General Agency contained all the agreements between the parties.  (Doc. No. 60, Ex. A at 41:15 - 42:1; 63:5-17; Doc. No. 60-3 at 28 of 54).  Further, the written agreement clearly and unambiguously provided that either party could terminate the general agency at any time upon written notice and that any debt would be due and payable upon termination.  Thus, to the extent Counter-Plaintiffs now claim they relied on any such alleged oral representations, which are directly contradicted by the express, unambiguous terms of the written agreement, they would not, as a matter of law, have been justified in doing so.[4]  The Court concludes that Guardian's Motion for

_____

[4] Counter-Plaintiffs appear to rely on *Pleasant v. Bradford*, 260 S.W.3d 546 (Tex.App.–Austin 2008, review denied) to support an argument for detrimental reliance. To the extent this is the case, the Court is of the opinion that their reliance is misplaced.  Unlike *Pleasant*, which involved an error in the square footage of a house contained in the MLS listing, the alleged oral representation here was directly contradicted by the express language in the written contract and, thus, any reliance would have been unreasonable.

13

Summary Judgment should, therefore, be granted at to Counter-Plaintiffs' Texas Insurance Code and DTPA claims.

### 2. *Fraud and Fraudulent Inducement*

Counter-Plaintiffs next claim that Guardian fraudulently induced them to enter the contract. To establish a claim for fraud or fraudulent inducement requires: (1) a material misrepresentation, which was false, and (2) that was either known to be false when made or was asserted without knowledge of its truth, (3) which was intended to be acted upon, (4) which was relied upon, and (5) which caused injury. *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998). A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made. *Id.* at 48. However, the mere failure to perform a contract is not evidence of fraud. *Id.* Instead, the plaintiff is required to present evidence that the defendant made representations with the intent to deceive and with no intention of performing as represented. The evidence must be relevant to defendant's intent at the time the representations were made. *Id.*

Counter-Plaintiffs make three allegations concerning their claim for fraud which the Court will address in turn. First, Counter-Plaintiffs allege that Guardian made a false representation "before [Kinder] agreed to sign [the] general agency contracts[, specifically] that indebtedness would not be considered until 2006." (Doc. No. 121 at 9, ¶ 38; *see also*, Doc. No. 121 at 21, ¶ 8)). Counter-Plaintiffs rely, in large part, on this alleged five-year oral agreement to form the basis of their fraud claim. Guardian disputes that any such oral representation was made and further argues that Counter-Plaintiffs' claim fails as a matter of law because any such oral agreement was directly contradicted by the written agreement between the parties and, therefore, negates reliance which

14

is a requisite element of the claim.  *DRC Parts & Accessories*, 112 S.W.3d at 858 (reliance on an

oral representation that is directly contradicted by unambiguous terms of a written contract is not

justified as a matter of law.).  The Court must agree with Guardian.  As best stated by the court in

*DRC*, "[a] party who enters into a written contract, while relying on a contrary oral agreement does

so at its own peril and is not rewarded with a claim of fraudulent inducement when the other party

seeks to invoke its rights under the contract."  *Id.* at 858-59.

Second, Counter-Plaintiffs allege that Guardian "insisted" that Kinder become personally

liable on an expensive office lease space, but then allowed the next agent to vacate the office space.

Even assuming, however, that Guardian had "insisted" Kinder assume the lease space, this would

not be sufficient, on the face of it, to constitute a material misrepresentation for purposes of

establishing a fraud claim.  *Airborne Freight Corp., Inc. v. C.R. Lee Enterprises, Inc.*, 847 S.W.2d

289, 294-95 (Tex.App.–El Paso, 1992, writ denied); *Sawyer v. Pierce*, 580 S.W.2d 117, 124-26

(Tex.Civ.App. 1979, writ ref'd n.r.e).

Finally, Counter-Plaintiffs allege that Guardian represented that if Cornerstone/Kinder joined

the AMF marketing program, they "should anticipate increased sales of 24% annually."  (Doc. No.

121 at 19, ¶ 3).   This claim fails for two reasons.   First, Kinder conceded in his deposition

testimony that the decision to enter into this program was his and that Guardian did not force him

to do so.  (Doc. No. 60, Ex. A at 82:24 - 83:1; 99:19-22; 121:1-3).  Second, even assuming the

truth of the statement, any such statement could only be construed as a future promise which does

not constitute a material misrepresentation. *See Sergeant Oil & Gas Co., Inc. v. Nat'l Maintenance*,

861 F.Supp. 1351, 1360 (S.D. Tex. 1994) (estimations, guesses or thoughts as to future happenings

are not actionable); *New York Life Ins. Co. v. Miller*, 114 S.W.3d 114, 124 (Tex.App.–Austin

2003, no writ) (recognizing distinction between statements of existing fact, which will form the basis of a negligent misrepresentation claim, as opposed to a promise of future conduct, which will not).

Consequently, the Court concludes that Counter-Plaintiffs' claims of fraud against Guardian fail as a matter of law and, therefore, Guardian's Motion for Summary Judgment should be granted as to those claims.

### 3.  *Unjust Enrichment*

Counter-Plaintiffs allege that "Guardian has been unjustly enriched by its actions, including [sic] by wrongfully obtaining Kinder's agency and the future business which Guardian will enjoy, including, but not limited to, the torturous [sic] interference of the USAA contracts between Kinder/Cornerstone and USAA (or could have enjoyed if reasonably managed) as a direct result of Kinder's work." (Doc. No. 121 at 22 ¶ 9).  As a remedy for Guardian's unjust enrichment, Counter-Plaintiffs ask the Court to impose a constructive trust.  (Doc. No. 121 at 22 ¶ 9).  Guardian moves for summary judgment on this equitable claim on the ground that it fails as a matter of law.

Texas law provides that when a valid agreement addresses an issue, as is the case here, the parties should be bound by their express agreement and precluded, as a matter of law, from recovering under equitable theories to thwart the effect of the contract.  *Fortune Products Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000); *Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 176 (Tex.App.–Houston [1st Dist.] 2006, no writ); *TransAm. Natural Gas Corp. v. Finkelstein*, 933 S.W.2d 591, 600 (Tex.App.–San Antonio 1996, writ denied).  The Court, therefore, concludes that

Counter-Plaintiffs' claim for unjust enrichment[5] fails and that Guardian's Motion for Summary Judgment should be granted on this issue.

### 4.  *Texas Theft Liability Act & Conversion*

Counter-Plaintiffs allege that Guardian unlawfully acquired, refused to return, and refused to compensate them for office equipment and other property in violation of the Texas Theft Liability Act.  (Doc. No. 121 at 24, ¶ 8).  Guardian maintains that Counter-Plaintiffs have failed to establish the requisite elements of this claim and, thus, it fails as a matter of law.  (Doc. No. 60 at 28, ¶ 61).

The provisions of the Texas Theft Liability Act ("TTLA") are codified in the Civil Practice and Remedies Act.  TEX. CIV. PRAC. REM. CODE § 134.001, *et seq.*  Under the TTLA, "[a] person who commits theft is liable for the damages resulting from the theft."  TEX. CIV. PRAC. & REM.CODE §134.003(a) (Vernon 2005).  Theft is defined as "unlawfully appropriating property or unlawfully obtaining services" as prohibited by, *inter alia*, § 31.03 and § 31.05 of the Texas Penal Code.  TEX. CIV. PRAC. & REM.CODE § 134.002(2) (Vernon 2005).  Section 31.03 prohibits the unlawful appropriation of property with an intent to deprive the owner of the property.  "Unlawful appropriation" includes, in relevant part, appropriation[6] "without the owner's effective consent" or of stolen property when "the actor appropriates the property knowing it was stolen by another."  TEX. PENAL CODE § 31.03(b)(1) & (2) (Vernon 2003).

---

[5] Unjust enrichment is an equitable theory of recovery (*Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990)) and, when it exists, a court may impose a constructive trust as an equitable remedy.  *See, e.g.*, *In re Bradley*, 501 F.3d 421, 432 (5th Cir. 2007) (applying Texas law);  *Troxel v. Bishop*, 201 S.W.3d 290, 297 (Tex.App.–Dallas, 2006, no writ).

[6] "Appropriate" means "to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; or [ ] to acquire or otherwise exercise control over property other than real property."  TEX. PENAL CODE § 31.01(4) (Vernon 2003).

Counter-Plaintiffs' TTLA claim fails for two reasons.  First, there is no evidence that Guardian unlawfully appropriated or stole either Counter-Plaintiffs' property or services.  Second, there is no evidence of Guardian's intent to deprive Counter-Plaintiffs of their property or services.  Having failed to establish the requisite elements of a claim under the TTLA, the Court concludes that Guardian's Motion must be granted and that this claim must be dismissed.

In addition to their claim under the TTLA, Counter-Plaintiffs allege that Guardian unlawfully converted their office equipment and other property when it refused to return and/or compensate them for the property.  (Doc. No. 121 at 24, ¶ 8).  Guardian maintains that Counter-Plaintiffs have also failed to establish the requisite elements of this claim and, thus, it, too, fails as a matter of law. (Doc. No. 60 at 29-30, ¶¶ 62-63).

To establish conversion of property, a plaintiff must prove each of the following elements: "(1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property." *Burns v. Rochon*, 190 S.W.3d 263, 268 (Tex.App.-Houston [1st Dist.] 2006, no writ) (citing *Apple Imports, Inc. v. Koole*, 945 S.W.2d 895, 899 (Tex.App.-Austin 1997, writ denied)).  Unlike theft, the common law tort of conversion does not require proof of wrongful intent. *See Schwartz v. Pinnacle Comm'ns*, 944 S.W.2d 427, 432-33 (Tex.App.-Houston [14th Dist.] 1997, no writ).  However, a claim for conversion fails as a matter of law when there is no evidence that plaintiff made a demand for the return of the property and no evidence that defendant refused to return it. *Whitaker v. Bank of El Paso*, 850 S.W.2d 757, 760-62 (Tex.App.–El Paso 1993, no writ).  In the present case, Counter-

Plaintiffs' conversion claim fails because there is simply no evidence that Counter-Plaintiffs ever asked for the return of the property; nor is there any evidence that Guardian refused to return the property.

### 5. _Tortious Interference_

Counter-Plaintiffs bring a counter-claim against Guardian alleging that it tortiously interfered with their contract with USAA.  (Doc. No. 121 at 24, ¶ 9).  Guardian moves for summary judgment on the tortious interference claim on the following grounds: (1) it was not a stranger to the contract and, hence, could not have interfered with it; (2) estoppel; and (3)  its conduct is not actionable because it acted under justification.  (Doc. No. 60 at 30-35).

To establish a claim for tortious interference with a contract, the plaintiff must prove the following:  (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss that resulted.  _Powell Indus., Inc. v. Allen_, 985 S.W.2d 455, 456 (Tex. 1998) (citing _ACS Investors, Inc. v. McLaughlin_, 943 S.W.2d 426, 430 (Tex. 1997)).

Although the law imposes a general obligation not to interfere with existing contracts, it does not extend the obligation to a person who is a party to the contract based on the premise that "a party cannot tortiously interfere with its own contract."  _Holloway v. Skinner_, 898 S.W.2d 793, 796 (Tex.1995).  Nor does the law extend the general obligation to corporate agents unless the agent's actions are completely contrary to corporate interests.  _Id_.  Thus, where a person has connections with the contract, generally no liability for tortious interference will result.  _In re Vesta Ins. Group_, 192 S.W.3d 759, 761-62 (Tex. 2006).  Stated differently, the law essentially requires that "a person must be a stranger to a contract to tortiously interfere with it."  _Morgan Stanley &_

*Co., Inc. v. Texas Oil Co.*, 958 S.W.2d 178, 179 (Tex.1997).

Counter-Plaintiffs maintain that Guardian was not a party to the USAA contract and, as a result, was a stranger to the agreement. (Doc. No. 75 at 12). While it is true that Guardian was not a signatory to the USAA contract, the agreement clearly reflects that it was connected to the agreement. Thus, based on the undisputed evidence, the Court finds that Guardian was not a stranger to the agreement which effectively negates liability under a theory of tortious interference. *In re Vesta Ins. Group*, 192 S.W.3d at 761-62; *Morgan Stanley*, 958 S.W.2d at 179.

Nevertheless, even assuming interference could be shown, Guardian's actions were justified. Under Texas law, even if the plaintiff establishes all the elements of a claim of tortious interference with a contract, the defendant may negate liability if it establishes the elements of the defense of privilege or justification. *Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 77-78 (Tex. 2000). A party is privileged to interfere with the contractual relations of another if: (1) it acts in the bona fide exercise of its own rights, or (2) the interfering party has an equal or superior right in the subject matter to that of the party to the contract. *Id.* at 80. Justification is established as a matter of law when the defendant's acts, which the plaintiff claims constitute tortious interference, are merely done in the defendant's exercise of its own contractual rights, regardless of motive. *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex.1996).

Here, the USAA Brokerage Agreement contained the following provision:

> This Agreement shall run for an indefinite period subject to termination at any time by either of the parties by notice in writing, or automatically by nonrenewal of Guardian appointment, state license or termination of Principal's [Kinder's] agreement with the Company [Guardian] . . . . In the event of termination of the Principal's agreement with the Company [Guardian], subject to all the terms and conditions fo this Agreement, the Company [Guardian] hereby guarantees the payment of commissions and persistency payments to the Broker [USAA] as provided for herein.

(Doc. No. 75-3 or "GLIC 01173").  Thus, under this provision, Counter-Plaintiffs gave Guardian explicit rights and, pursuant to those rights, Guardian continued to operate under the USAA agreements after Cornerstone/Kinder was terminated.  While Counter-Plaintiffs attempt to counter this contractual provision by way of the deposition testimony of Mr. Manning, a Guardian executive, the Court, having carefully reviewed the testimony, finds that it fails to create a disputed issue of material fact to preclude summary judgment for Guardian on this claim.  (Doc. No. 90 at 2-3 & Ex. A; Doc. No. 91 at 3-5).  Accordingly, even to the extent any interference existed, the Court concludes that Guardian was justified in exercising its rights to continue the agreement.

### B.  Breach of Contract Claim

Guardian alleges that Defendants are in breach of the contracts and are liable for actual damages and attorney's fees resulting from their refusal to pay a debt due and owing to Guardian under the various agreements between the parties.  Defendants respond by arguing that Guardian breached the contracts by wrongfully terminating the agreements and, having first breached the contracts, it cannot now seek to hold Defendants responsible.  (Doc. No. 75 at 12-13).  Defendants also respond by arguing that Guardian is not entitled to summary judgment on its breach of contract claims because the debts of Counter-Plaintiff Gary D. Kinder have been discharged in bankruptcy. (Doc. No. 75 at 13; Doc. No. 121 at 1).

To state a claim for breach of contract under Texas law, a plaintiff must show "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.*, 51 S.W.3d 345, 351 (Tex.App.–Houston [1st Dist.]

2001, reh'g overruled)).

In the present case, the summary judgment evidence clearly establishes that valid contracts existed between the parties.  There is also no dispute that Guardian acted or performed under the contracts by making loans and providing the agreed services to the Defendants.  Nor is their any real dispute as to the amount of damages Guardian claims.  Instead, the dispute in this case appears to center on who breached the contracts.  Guardian maintains that it terminated the agreements in accordance with the express terms of the contracts.  Guardian further maintains that, upon termination, it requested that Defendants repay the debt owed, but its request was refused and, thus, Defendants are in breach.  Defendants insist that, based on the oral assurances made by Guardian before they signed the agreements,[7] Guardian breached the agreements when it terminated the contracts and demanded payment of the debt.  (Doc. No. 75 at 9).  Guardian has responded by denying that any such oral assurances or agreements were made and insists that the written agreements between the parties, which are not ambiguous, control.

The law recognizes that "[i]f the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Having carefully reviewed the contracts in this case, the Court finds no ambiguities exist in the agreements as alleged by Defendants.  To the contrary, the General Agency Agreement clearly provided that either party had the right to terminate it, without notice, for any reason.  Further, the

---

[7] Defendants maintain that Guardian verbally agreed that the Defendants would have five years from January 1, 2002, to repay any indebtedness which they incurred through Guardian; that  Kinder would have two years to take on additional debt; that in his third year Kinder would level out the debt; and that the debt would be repaid in Kinder's fourth and fifth years.  (Doc. No. 75 at 4 & Ex. A (Kinder Affidavit)).

22

agreements clearly set forth how and when debt was to be repaid upon termination.  In fact, despite Defendants' arguments to the contrary, there is nothing in the contracts that refers to any such alleged five year plan.  Kinder concedes as much in his deposition testimony.[8]   In addition, contrary to Kinder's assertions, there is nothing in the contracts that provides for a graduated repayment of the debt following termination.  Instead, the agreements very clearly provide that it is terminable without cause and, upon termination of the agreements, when the debt, if any, must be paid.  Defendants' contentions, which can be reduced to the argument that, regardless of the contractual provisions, "I signed based on their word" (Doc. No. 75 at 13) are, insufficient, as a matter of law, to alter the express terms of these written contracts.  *Weinacht v. Phillips Coal Co.*, 673 S.W.2d 677, 679 (Tex.App.-Dallas 1984, no writ) ("a written instrument presumes that all prior agreements of the parties relating to the transaction have been merged into the written instrument");  *Jack H. Brown & Co. v. Toys "R" Us, Inc.*, 906 F.2d 169, 173 (5th Cir.1990) (written agreements are presumed to be completely integrated).  Moreover, the law imposes an obligation upon a person to read a contract before signing it, and will not as a general rule be heard to complain of an oral misrepresentation the error of which would have been disclosed by reading the contracts.  *Farina v. Calvary Hill Cemetery*, 566 S.W.2d 650 (Tex.Civ.App.1978).  According, finding no ambiguity in the contracts, Defendants will not be permitted to alter the express terms of the written agreements with parol evidence.   *See Tripp Village v. Mbank Lincoln Centre*, 774 S.W.2d 746, 749 (Tex.App.–Dallas 1989, no writ) (the parole evidence rule bars enforcement of

---

[8] To the extent he attempts to do so, the Court will not permit Kinder, in a subsequently prepared affidavit, to alter his sworn testimony on this issue.  *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) ("[i]t is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony.").

prior or contemporaneous agreements introduced to vary, add to, or contradict terms of a fully integrated written instrument).  *Rincones v. Windberg*, 705 S.W.2d 846, 849 (Tex.App.-Austin 1986, no writ) ("the parol evidence rule prohibits the admission of oral evidence which alters the payment terms of a written contract.").

Having established all the requisite elements of their breach of the contracts claim, the Court concludes that Guardian should be entitled to recover its damages under the contracts.  Notably, Defendants do not dispute the calculation or amount of the damages claimed.[9]  Nonetheless, Defendant Gary D. Kinder, in his individual capacity, maintains that he cannot be held liable on the breach of contracts claim because any amount he might have owed under the contracts was discharged in bankruptcy.  (Doc. No. 121, Ex. A).  Kinder is, of course, correct in his position.  *See generally*, *In re Donelson*, _B.R._, 2009 WL 2225564 * 7 (Bkrtcy S.D. Tex. 2009) (unless excepted, bankruptcy discharges debts).  Accordingly, the Court concludes that, while Guardian has established all the requisite elements for its breach of contract claim, it is *only* entitled to recover its damages for the breach from Gary D. Kinder & Associates, Inc. d/b/a Cornerstone Financial Group.

## C.  Attorney's Fees

Guardian seeks to recover attorney fees pursuant to § 38.001 *et seq.*, of the Texas Civil Practice and Remedies Code.  (Doc. No. 67 at 22).  Defendant Cornerstone/Kinder merely argues that Guardian is not entitled to recover attorney's fees under § 38.001 because it has not, and will not prevail.

---

[9] The amount of damages under the contract, which is not disputed, total $1,321,616.14 and, as provided in the contract, will continue to incur interest at a rate of 7.75% per annum from and after July 1, 2008 until payment in full.

Section 38.001 of the Texas Civil Practice & Remedies Code, in relevant part, provides that "[a] person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: … an oral or written contract." TEX. CIV. PRAC. & REM.CODE § 38.001 (Vernon 2008). In order to recover attorney's fees pursuant to § 38.001, a party must be a prevailing party and recover actual damages on its claim. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex.1997) ("To recover attorney's fees under § 38.001, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover [actual] damages."); *see also*, *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 201 (Tex.2004) (per curiam) (noting that even though the claimant had a valid claim, it "was not entitled to recover attorney's fees because it was not awarded damages on its breach of contract claim"). In the present case, the Court finds that Guardian is entitled to attorney fees under the statute because it is the prevailing party in this action and is entitled to recover actual damages on its breach of contracts claim.

The Court now turns to the amount of attorney's fees recoverable. Texas law provides that when the prevailing party proves the usual and customary attorneys' fees for the claim, the fees are presumed reasonable under § 38.003 of the Texas Civil Practice and Remedies Code. *Carlyle Real Estate Ltd Partnerhip-X v. Leibman*, 782 S.W.2d 230, 233 (Tex.App.–Houston [1st Dist.] 1989, no writ). Furthermore, once the presumption attaches, it can only be rebutted by competent evidence. TEX. CIV. PRAC. REM. CODE § 38.003; *AU Pharm., Inc. v. Boston*, 986 S.W.2d 331, 339 (Tex.App.–Texarkana 1999, no writ).

Guardian seeks to recover legal fees in the amount of $228,105.00 for legal services rendered from March 14, 2006 through June 23, 2008. (Doc. No. 60, Ex. E (Steven Watkins'

Affidavit) at 1, fn. 1 (explaining that while Guardian incurred additional attorney fees, it seeks to recover only the amount and time period specified)).   Guardian's request for attorney's fees is supported by a sworn affidavit from its attorney, Steven Watkins. *Clougly v. NBC Bank-Seguin, N.A.*, 773 S.W.2d 652, 657-58 (Tex.App.–San Antonio, 1989, writ denied) (a sworn affidavit may be used to establish that reasonableness of the work performed and fees incurred).   Mr. Watkins swears that the facts he sets forth in his affidavit are true and correct and based on his personal knowledge.  (Doc. No. 60, Ex. E at 1).  In the affidavit, Mr. Watkins stated that he represents The Guardian Life Insurance Company in this action and that the attorneys' fees sought are sought as part of Guardian's Motion for Summary Judgment against Defendants.  (*Id.*).  Mr. Watkins attests that "in the period of March 14, 2006, through June 23, 2008," a total of 783.80 hours of legal services were performed for Guardian in this case.  (*Id.* at 2).  Mr. Watkins stated his hourly rate for the legal services performed was $325.00 and that his rate was reasonable and customary in the Houston, Texas, area.  (*Id.*).  Mr. Watkins also provided the hourly rates charged by other attorneys and legal assistants at the firm who performed work on this case for Guardian and avers that these rates were reasonable and customary for the area.  (*Id.*).  Mr. Watkins also stated that "in reaching the opinions set forth in [his] Affidavit" he duly considered the factors set forth in the Texas Rules of Professional Conduct which are "applicable to a determination of the reasonableness of the total fee sought in this case." (*Id.* at 3).  Although having ample opportunity, Defendants have not contested or otherwise challenged counsel's affidavit regarding the amount or the reasonableness of the attorneys' fees requested.  Based on the existing facts and circumstances of this case, as well as the competent and undisputed evidence concerning the fees, the Court concludes that Guardian, as the prevailing party, is entitled to recover attorneys' fees in the amount of

$228,105.00 for the legal services rendered to it in this action.

CONCLUSION

Accordingly, for the foregoing reasons, it is the **ORDER** of this Court that Plaintiff Guardian's Motion for Summary Judgment (Doc. No. 60) is **GRANTED** as to Counter-Plaintiffs' claims against Guardian and these claims are hereby **DISMISSED with prejudice**; and that Guardian's Motion for Summary Judgment for breach of contract and attorney's fees is **GRANTED** as to Gary D. Kinder & Associates, Inc. d/b/a Cornerstone Financial Group, but **DENIED** as to Defendant Gary D. Kinder, in his individual capacity, due to his discharge in bankruptcy.

It is further **ORDERED** that Guardian recover judgment against Defendant Gary D. Kinder & Associates, Inc. d/b/a Cornerstone Financial Group in the sum of $1,321,616.14, together with interest thereon at the rate of 7.75% per annum until paid in full; attorneys' fees in the amount of $228,105.00, and all costs.

**DONE** at Galveston, Texas, this _____28th_____ day of September, 2009.

_____
John R. Froeschner
United States Magistrate Judge